**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**

Jerome Moyston


        v.                                    Civil No. 09-cv-0045-PB

James M. O'Mara, Superintendent,
Hillsborough County Department
of Corrections, et al.

**REPORT AND RECOMMENDATION**

Before the Court is Jerome Moyston's complaint (doc. no. 1)
and addenda (doc. nos. 6 & 12), filed under 42 U.S.C. § 1983,
seeking damages and other relief from defendants, the
superintendent of the Hillsborough County Department of
Corrections ("HCDOC") and certain HCDOC staff or contractors.[1]
Moyston, a pretrial detainee, alleges violations of his rights
under the First and Fourteenth Amendments, and other federal
laws, primarily relating to a denial of medical care, missing or
late mail, HCDOC grievance procedures, and the law library.  The
matter is before me for a preliminary review to determine, among
other things, whether the Complaint (defined herein as including
doc. nos. 1, 6 & 12) states any claim upon which relief might be

---

[1]Defendants include James O'Mara, HCDOC Superintendent;
David Dion, HCDOC Assistant Superintendent; Capt. Willie Scurry;
Cellee Beurdoin, Mailroom clerk; Nancy Davine, Law Library clerk;
and Denise Ryan, HCDOC Nurse.  For reasons stated herein, Nurse
Descar and Dr. Braga, a physician, are also named as defendants
in the Order issued this date, directing service of the
Complaint.

1

granted.  <u>See</u> 28 U.S.C. § 1915A(a); United States District Court, District of New Hampshire, Local Rule ("LR") 4.3(d)(2).

<u>Standard of Review</u>

Under this Court's local rules, when an incarcerated plaintiff commences an action pro se and in forma pauperis, the Magistrate Judge conducts a preliminary review.  LR 4.3(d)(2). In conducting the preliminary review, the Court construes pro se pleadings liberally, however inartfully pleaded.  <u>See</u> <u>Erickson v. Pardus</u>, 551 U.S. 89, 94 (2007) (per curiam) (following <u>Estelle v. Gamble</u>, 429 U.S. 97, 106 (1976), to construe pro se pleadings liberally in favor of the pro se party).  "The policy behind affording pro se plaintiffs liberal interpretation is that if they present sufficient facts, the court may intuit the correct cause of action, even if it was imperfectly pled."  <u>Ahmed v. Rosenblatt</u>, 118 F.3d 886, 890 (1st Cir. 1997); <u>see also</u> <u>Castro v. United States</u>, 540 U.S. 375, 381 (2003) (courts may construe pro se pleadings to avoid inappropriately stringent rules and unnecessary dismissals).  The court must accept as true the plaintiff's factual assertions, <u>see</u> <u>Erickson</u>, 551 U.S. at 94, and any inferences reasonably drawn therefrom.  <u>See</u> <u>Centro Medico del Turabo, Inc. v. Feliciano de Melecio</u>, 406 F.3d 1, 5–6 (1st Cir. 2005); <u>Ayala Serrano v. Lebron Gonzalez</u>, 909 F.2d 8, 15 (1st Cir. 1990).  This review ensures that pro se pleadings are given fair and meaningful consideration.

2

Moyston has attached a number of exhibits to his complaint
(doc. no. 1) and the addenda ("First Addendum" & "Second
Addendum") (doc. nos. 6 & 12).  In the interest of judicial
economy and fairness to the pro se litigant, all of these
documents (nos. 1, 6 & 12) shall be treated as the Complaint for
all purposes.  <u>See</u> Fed. R. Civ. P. 10(c) (exhibits shall be
considered to be part of the pleading for all purposes).

<u>Background</u>

I.  <u>Medical Treatment</u>

On December 5, 2008, several weeks after entering HCDOC,
Moyston saw Dr. Braga, a physician, for an entry physical.  <u>See</u>
First Addendum at 53-54 (doc. no. 6).  Moyston complained to
Braga about pain radiating from his testicles to his stomach.
Braga ordered a urine test, but did not thoroughly examine
Moyston.  Moyston did not receive the results of the urine test.
As he continued to suffer severe pain, he repeatedly requested
further medical examinations, but was not seen again by a doctor
until January 30, 2009, almost two months after his entry
physical.  <u>Id.</u>; Second Addendum at 1 (doc. no. 12).  At that
time, Braga performed a thorough examination and diagnosed
Moyston as having an infection.  Braga placed Moyston on
antibiotics and ordered another urine test.  First Addendum at
53-54 (doc. no. 6).

On December 8, 2008, Moyston told Nurse Descar, a nurse at

3

HCDOC, that he saw blood in his stool on a tissue.  Second
Addendum at 1 (doc. no. 12).  Descar told him that he should save
a sample and ask to see a nurse, advice that Moyston apparently
declined to follow.  See First Addendum at 51 (doc. no. 6).
Moyston characterizes this advice as "unsanitary,"
"unprofessional," and "unreasonable."  Id. at 51 & 55.

Sometime in January 2009, Moyston's left eye became red,
swollen, painful, and runny, and a boil appeared under his
eyelid.  See id. at 53-54; Second Addendum at 1 (doc. no. 12).
The condition affected his vision.  First Addendum at 53-54 (doc.
no. 6).  Moyston filled out two medical requests and saw a nurse
twice.  Each time, the nurse characterized it as a sty.  At the
point when the pain became "unbearable," Moyston filed a third
request, labeling it an emergency.  Id.  Dr. Braga saw him two
days later, on January 30, 2009, and told him that he did not
have a sty, that the condition looked "'serious,'" "'like
something that might have to be cut off,'" and referred him to an
ophthalmologist.  Id.; see also Second Addendum at 1 (doc. no.
12).  On February 9, 2009, ten days after Moyston's appointment
with Braga, an ophthalmology appointment was in the process of
being scheduled for Moyston.  First Addendum at 53-54 (doc. no.
6); Second Addendum at 1 (doc. no. 12).

Moyston has a history of high blood pressure.  See Ex. to
Second Addendum at 1-2 (doc. no. 12-9).  On February 28, 2009,

4

Moyston told Nurse Descar, while she was making her rounds on the second shift, that he had a migraine; felt faint, cold, and dizzy; and had chest pain.  Id.  Descar told Moyston to lie down, and that he needed to sign up for an examination in the morning, which he had not done.  The next morning, March 1, Moyston filed a medical request form and handed it to Descar, telling her that his symptoms had worsened.  Moyston specifically requested that his blood pressure be checked.  Descar told him that she did not have anything for his symptoms with her and promised to come back at noon or have him brought down later to take his blood pressure.  Moyston received Tylenol and Sudafed that night, but Descar did not check Moyston's blood pressure until the next day, March 2.  Descar ordered daily blood pressure checks on Moyston for 5 days thereafter.  According to Moyston, Descar told him on March 2 that his blood pressure was high, but according to HCDOC records, Moyston's blood pressure, temperature, pulse, and respiration were all within normal limits.  Id.

II.  Law Library

The HCDOC law library has limited resources, and inmates' access to the facility is regulated.  The library's collection of bound case reports ends after a certain date, and pages and entire volumes are missing from certain books or series.  Inmates have access to LEXIS to find materials, but cannot print from LEXIS.  The HCDOC internal guidelines and procedures are not

available in the library, and Moyston received a bill for copies
when he asked to see these documents.

Defendant Nancy Davine is a GED teacher who staffs the
library.  According to Moyston, Davine lacks sufficient training
for her job as the law library clerk.  Davine's teaching of GED
classes in the library distracts inmates engaged in legal
research.  See Ex. to Second Addendum at 1-2 (doc. no. 12-8).

Detainees generally have access to the law library two days
per week, up to 2 hours per day.  Inmates are not routinely
granted make-up days if the library is closed on their designated
library days.  In addition, inmates who need to use the bathroom
while in the library must leave for their housing units, but
cannot thereafter return to the library.  Ex. to Second Addendum
at 1 (doc. no. 12-5).

The library was closed on January 28, 2009, the day before
Moyston's arraignment, when he had planned to use the law library
to prepare an argument for lower bail.  Moyston waived
arraignment on January 29 because he did not have time to prepare
an argument for lower bail.

Inmates using the library have permission to copy motions
that they intend to file with the court, but are not otherwise
permitted to make copies in the library.  On February 4, 2009,
Davine refused to copy a letter to the superintendent that
Moyston had drafted.  One week later, on February 11, Moyston

6

again attempted to make a copy of a letter to the superintendent in the library, and Davine told Moyston that he could not copy it.  Several minutes later, another inmate attempted to copy the letter for Moyston.  Davine called for an escort to have both inmates removed from the library and threatened to deny Moyston law library access in the future.

Moyston was not on the library access list one week later, on February 18, when he wanted to copy a notarized document for filing with the court.  Moyston complained about his exclusion to defendant Capt. Willie Scurry, who told Moyston he would look into the issue and get back to him.  When Scurry did not return as promised, Moyston became frustrated.  Moyston's protest escalated into his refusal to submit to a lock down order, which led to his reclassification into maximum security for 30 days, after an investigation and hearing on the charges.

Maximum security detainees are not granted physical access to the library, but may submit requests for copies of legal research materials for cell delivery.  While Moyston was in maximum security, he missed eight library days.  During this time, he asked for copies of approximately ten cases, but was only granted summaries and outlines.  Moyston agreed to accept three cases reproduced in their entirety, but maintained that he needed full copies of all of the cases that he had requested. Moyston also submitted requests for specific materials, but the

HCDOC provided him with the wrong documents.

III. Inmate Request and Grievance Issues

To initiate the grievance process in the HCDOC, inmates must file a written "inmate request" to obtain a grievance form. Moyston filled out four requests for grievance forms to complain about his exclusion from the library and five requests for grievance forms to complain about the lost pictures before the forms were provided to him.

On May 26, 2009, Moyston filed a grievance charging that he has suffered a prejudicial application of the grievance procedures because each time he has filed a grievance against defendant Scurry, including allegations that Scurry has lied, Scurry himself investigated and issued a response on the matter. Defendant David Dion, HCDOC Assistant Superintendent, signed off on each of these decisions.  See Ex. to Second Addendum at 1-2 (doc. no. 12-6).

On June 8, 2009, defendant James O'Mara, HCDOC Superintendent, sent a letter to Moyston informing him that HCDOC employees would no longer be required to respond to his grievances, unless they involved "personal safety, being in imminent danger, or . . . an unaddressed serious medical need." Ex. to Second Addendum at 2 (doc. no. 12-4).  Citing the HCDOC Inmate Handbook, O'Mara stated that Moyston abused the grievance system by filing more than 30 grievances between January and June

2009.  See id.  Moyston has since filed inmate requests in lieu
of grievances, some of which have not been answered, including
his request for a reason why Scurry said Moyston could not take
law correspondence courses while at HCDOC.

IV.   Lost & Late Mail

On January 5, 2009, Moyston's girlfriend mailed family
pictures to Moyston at the HCDOC, but Moyston did not receive
them.  Defendant Cellee Beurdoin responded to Moyston's inquiry
about the pictures on behalf of the mailroom staff, telling him
that the mailroom did not have the pictures, and that the
mailroom would forward them to him if they were found.  Moyston
later spoke with his girlfriend, and she said that the pictures
had been mailed back to her from the HCDOC.  On January 23, 2009,
the girlfriend remailed the photos, but Moyston never received
them.  Moyston filed a grievance about the lost pictures in
February 2009, which he filed as an attachment to his initial
complaint in this action (see doc. no. 1).

On April 28, 2009, after Moyston filed this action,
Moyston's girlfriend sent him a money order that Moyston never
received, which he had intended to use to cover the filing fee.
Ex. to Second Addendum at 1-2, 11 (doc. no. 12-2).  A number of
letters, including legal papers, have since been delivered to
Moyston late.  Id. at 11.  In addition, several letters have been
delivered in damaged envelopes with the return address rewritten,

or combined in a single envelope and delivered late.  <u>Id.</u> at 2-3.
Moyston filed a number of grievances relating to these issues.

V.   <u>Storage of Legal Papers</u>

Moyston has accumulated legal paperwork in his cell and has
asked for two storage boxes so that he can file his legal work in
his cell.  Moyston received one box on April 24, 2009, but his
July 25 request for a second box was denied by Capt. Hiscoe.
Citing safety concerns relating to the accumulation of paper,
Hiscoe directed Moyston to send his excess legal work out of his
cell to be stored with his personal property in booking if he
could not maintain it in one box.  <u>Id.</u> at 13-14.

VI.  <u>Claims</u>

In the Complaint (doc. nos. 1, 6 & 12), Moyston has asserted
the following claims under 42 U.S.C. § 1983 and other laws:

> 1.   Moyston has suffered a violation of his right, as a
> pretrial detainee, to adequate medical treatment under the
> Due Process Clause of the Fourteenth Amendment, with respect
> to (a) blood in his stool; (b) the two-day delay in
> examining him and taking his blood pressure in
> February/March 2009; (c) delays in examining and treating a
> condition affecting his left eye in January and February
> 2009; and (d) delays in diagnosing and treating his
> testicular pain from December 2008 to February 2009.
>
> 2.   Moyston has suffered punishment in violation of his
> federal constitutional rights as to:  (a) the policy of
> forbidding pretrial detainees from returning to the law
> library during their scheduled library time if they must
> leave early to use the bathroom; (b) the decision that
> Moyston may only maintain one storage box of legal work in
> his cell; and (c) Scurry's telling Moyston that he cannot
> take pre-law correspondence courses.
>
> 3.   Moyston has suffered a violation of his Fourteenth

10

Amendment right of access to the courts because of the law
library's inadequate resources, lack of trained staff,
limited hours, incomplete sets of bound volumes, limited
quiet space, and restrictions on printing cases, as well as
its policy of barring maximum security inmates from having
physical access to the law library.  Specifically, on
January 29, 2009, Moyston suffered harm in his criminal case
because the law library was closed the day before, in
violation of his right of access to the courts under the
Fourteenth Amendment.

4.   Moyston, while classified as a maximum security inmate
in late February and March 2009, suffered a violation of his
right to equal protection under the Fourteenth Amendment
because he was denied physical access to the library.

5.   Moyston has suffered retaliation for exercising his
First Amendment rights to free speech and to petition the
government for a redress of grievances, as follows:  (a)
Davine's exclusion of Moyston from the law library was
retaliatory for his filing a grievance about the library;
(b) Beurdoin's tampering with Moyston's mail since April 28,
2009 was retaliatory for this lawsuit; and (c) O'Mara's
restriction on Moyston's ability to file grievances was
retaliatory for this lawsuit.

6.   The HCDOC's grievance procedures violate the Fourteenth
Amendment due process rights of detainees.

7.   Beurdoin and Scurry are criminally liable for making
false statements; and Beurdoin is additionally criminally
liable for tampering with Moyston's mail.

8.   Moyston is entitled to receive copies of certain
documents from HCDOC without charge under the Freedom of
Information Act, 5 U.S.C. § 552 ("FOIA").

<u>Discussion</u>

I.   <u>Section 1983 & Pretrial Punishment</u>

Moyston has filed each of his claims under 42 U.S.C. § 1983,

including claims asserting that he has suffered from inadequate

medical care and certain restrictions on his liberty constituting

punishment.  Section 1983 creates a cause of action against those

who, acting under color of state law, violate federal
constitutional or statutory law.  See id.; Parratt v. Taylor, 451
U.S. 527, 535 (1981); Wilson v. Town of Mendon, 294 F.3d 1, 6
(1st Cir. 2002).

The particular constitutional provision that an inmate may
assert in a § 1983 action may depend on his or her status as a
detainee or prisoner.  Convicted prisoners may rely on the Eighth
Amendment's prohibition against cruel and unusual punishment,
while pretrial detainees are protected from punishment by the
Fourteenth Amendment's Due Process Clause.  See Surprenant v.
Rivas, 424 F.3d 5, 13 (1st Cir. 2005).  Accordingly, I construe
Moyston's claims regarding medical care and punishment as being
asserted under the Fourteenth Amendment.  Any claim under the
Eighth Amendment should be dismissed from this action.

II.  Medical Care (Claim I)

According to the Complaint, Moyston has received inadequate
medical care during his time at HCDOC relating to the following
four medical conditions:  blood in his stool; blood pressure
issues; pain in his testicles; and a problem with his left eye.
The Fourteenth Amendment standard for evaluating a pretrial
detainee's claim of inadequate medical care is practically the
same as, and at least as protective as, the Eighth Amendment
standard.  Burrell v. Hampshire County, 307 F.3d 1, 7 (1st Cir.
2002); see also Ruiz-Rosa v. Rullan, 485 F.3d 150, 155 (1st Cir.

2007).  Inmates are protected from intentional delays or denials
of access to medical care that manifest a prison official's
deliberate indifference to the inmate's serious medical needs.
See Estelle v. Gamble, 429 U.S. 97, 104-05 (1976).

To assert a viable claim for inadequate medical care, a
prisoner must first state facts sufficient to allege he or she
suffered from objectively "serious medical needs."  See id. at
105-06.  The inmate must then allege "deliberate indifference,"
that is, the responsible prison official's awareness of the
serious medical need (or the facts from which the need could be
inferred), and his or her failure to provide adequate treatment.
See id.  If a medical care claim is based on delayed provision of
care, the inquiry is whether the delay caused or gave rise to a
substantial risk of serious harm to the prisoner, and whether the
prison official was deliberately indifferent to this risk.
See Chambers v. N.H. Prison, 562 F. Supp. 2d 197, 200 (D.N.H.
2007).  To be found deliberately indifferent, "'a prison official
subjectively must ... be aware of facts from which the inference
could be drawn that a substantial risk of serious harm exists,
and he must also draw the inference.'"  Ruiz-Rosa, 485 F.3d at
156 (internal quotation marks and citation omitted).

Moyston's allegations pertaining to the blood in his stool
do not give rise to a viable Fourteenth Amendment claim.  The
nurse told Moyston that she needed a specimen to evaluate his

13

condition.  While Moyston asks rhetorically how he could collect and store such a sample in a sanitary manner, he has alleged neither that he was denied a specimen container, nor that a nurse would not promptly receive a specimen if he provided one.  Nor has he alleged that his condition persisted, that he continued to complain about it, or that he otherwise presented a serious medical need requiring further attention.  Moyston's claim relating to blood in his stool should therefore be dismissed.

Moyston alleges that the two-day delay in taking his blood pressure and examining him, given his chest pain, history, and other symptoms, constituted deliberate indifference to a serious medical need.  Construing Moyston's allegations with a common sense understanding of the serious risks inherent in failing to examine a man who seeks emergency attention for chest pain, who feels cold, faint, and dizzy, and has a history of high blood pressure, I find sufficient allegations of deliberate indifference to a substantial risk of serious harm in the two-day delay in examining Moyston to warrant service of this claim. While Moyston may not ultimately recover damages, he has pleaded sufficient facts to avoid dismissal at this time.

The claims relating to Moyston's eye condition and testicular and stomach pain are also based on delays allegedly manifesting deliberate indifference, occurring before Moyston was properly diagnosed, treated, or referred for evaluation.  As to

14

these claims, dismissal at this stage is similarly inappropriate.
The allegations, construed in a light most favorable to Moyston,
are sufficient to set forth a claim that a delay in diagnosis and
treatment caused Moyston to suffer severe pain in the interim and
manifested deliberate indifference to his serious medical needs.
Among other things, Moyston has alleged that he complained about
severe pain in his testicles and stomach for more than one month
before he was properly examined, diagnosed, and treated.  As to
the eye condition, Moyston suffered without any treatment and
complained for days before Dr. Braga finally examined him and
recommended that he see an ophthalmologist.  Thereafter, more
than ten days passed before Moyston actually saw an
ophthalmologist.  While the facts may ultimately show that the
delay did not constitute deliberate indifference, the allegations
are sufficient at this time to warrant service.  Cf. Rand v.
Simonds, 422 F. Supp.2d 318, 329-30 (D.N.H. 2006) (rejecting
medical care claim on summary judgment where no evidence
suggested that implementing treatment sooner would have
measurably improved condition).

    I note that Moyston has named Denise Ryan as a defendant,
but not Dr. Braga or Nurse Descar.  It is clear, however, that
Moyston considers Braga liable as to his testicular pain, and
Descar liable as to his blood pressure issues.  Accordingly, I
construe the Complaint as asserting the medical care claim

15

against Braga and Descar as well.

Therefore, as set forth more fully above, I recommend dismissal of the Fourteenth Amendment medical care claim as to the blood in Moyston's stool.  The claims relating to Moyston's eye condition, his testicular pain, and blood pressure may proceed, and I will direct service of these claims upon defendants, including Braga and Descar, in an Order issued this date.

III.  Storage Box, Library Time, and Pre Law Course (Claim II)

Alleging that he has suffered punishment, impermissibly levied upon him as a pretrial detainee, Moyston challenges Capt. Hiscoe's decision to deny him an extra box to store his legal work in his cell, Scurry's decision to deny him permission to take pre law classes by mail, and the HCDOC policy that bars him from returning to the library if he leaves for the bathroom.  In evaluating these claims, the court "'must decide whether the disability is imposed for the purpose of punishment or whether it is but an incident of some other legitimate governmental purpose.'"  O'Connor v. Huard, 117 F.3d 12, 16 (1st Cir. 1997). The government may impose administrative restrictions on pretrial detainees to "maintain security and order," but "'[i]f a restriction or condition is not reasonably related to a legitimate goal – if it is arbitrary and purposeless – a court permissibly may infer that the purpose of the governmental action

16

is punishment that may not constitutionally be inflicted upon detainees qua detainees.'" Id. (quoting Bell v. Wolfish, 441 U.S. 520, 538-39 (1979)).  The determination of whether a restriction is punitive may turn on whether the alternative rationale for the restriction is rationally connected with the restriction, or whether it is excessive in relation to it. See Bell, 441 U.S. at 538.

As to Scurry's telling Moyston that he could not take pre-law classes by correspondence, I recommend dismissal of this claim.  Scurry said "No" when Moyston asked him in the library if he could take such classes by mail and thereafter did not respond to Moyston's written request for a reason why.  The allegations are insufficient to suggest that Scurry's remark was intended as punishment, or that this remark had any punitive impact.  Moyston has not alleged, for example, that he would be otherwise qualified to take such classes but for Scurry's remark, or that such classes are available to persons at HCDOC.  Accordingly, the Court should dismiss this aspect of Moyston's claim under the Fourteenth Amendment.

Moyston's allegations relating to his loss of law library time when he has had to use the bathroom similarly fail to state a viable claim of unconstitutional punishment.  A rule preventing inmates from leaving and reentering the library at will to use the bathroom during a two-hour time slot is not punitive.  The

17

rule is reasonably related to the legitimate purpose of
preserving security and order in the institution.  See id. at 539
("without more").  Moyston's conclusory allegation that it is
"medically harmful" to wait two hours to use the bathroom, Ex. to
Second Addendum at 2 (doc. no. 12-5), does not effectively
bolster his claim, as he has not connected this allegation to his
own medical condition.  Accordingly, Moyston's claim relating to
lost library time should be dismissed.

     Moyston also claims that Capt. Hiscoe's decision to deny him
an extra storage box for his legal work was arbitrary and
punitive.  Hiscoe authorized Moyston to have one storage box of
legal work in his cell, but denied the request for a second box,
reasoning that paperwork exceeding the volume of one box would
"reasonably be considered a safety hazard."  Hiscoe directed
Moyston to send the excess to be stored with his property out of
his cell in booking.  Moyston asserts that this decision was
punitive and questions the value of having legal work stored in
booking, implying that he cannot use the materials unless they
are in his cell.  Moyston does not allege, however, that he could
not retrieve documents from booking promptly upon request.
Furthermore, Moyston provides no allegations suggesting that the
restriction was excessive relative to the rationale provided.
Should the policy of requiring Moyston to store excess legal work
out of his cell cause him harm in the future, amounting to a

violation of his right of access to the courts, see Bounds v.
Smith, 430 U.S. 817, 832 (1977), Moyston may be able to file a
suit based on that deprivation.  At this time, however, Moyston
has made no allegation that he has or will be harmed by having
some of his legal paperwork stored in booking.  Given the lack of
any allegations suggesting that the restriction was excessive in
relation to the legitimate rationale offered, I recommend
dismissal of the claim regarding the denial of a second storage
box.

IV.   Law Library (Claims III & IV)

      A.   Due Process & Access to Courts (Claim III)

      Moyston's due process claim regarding the law library
relates to its limited resources and hours of operation:  the
incomplete collection of bound or printed materials, lack of
quiet space, lack of trained staff, limited hours and days of
operation, and the restrictions on prisoners' ability to print
cases.  In addition, Moyston challenges the rule granting maximum
security inmates only cell delivery of copies of library
materials, not physical access to the library.  According to
Moyston, these factors affected his ability to prepare a defense
in his criminal case, particularly because his attorney from the
New Hampshire Public Defender's office has done "nothing at all"
for him.  First Addendum at 40 (doc. no. 6).

      Prisoners and pretrial detainees do not have a freestanding

right to law library access or trained legal assistance.  <u>See</u>
<u>Bourdon v. Loughren</u>, 386 F.3d 88, 92 (2d Cir. 2004) (citing <u>Lewis</u>
<u>v. Casey</u>, 518 U.S. 343, 351 (1996)).  Nor do they have a right to
a specific number of hours of law library access or trained
paralegal assistance while in detention.  Rather, they have a
constitutional right of access to the courts that affords them
access to the tools necessary to challenge their criminal cases,
convictions, and sentences directly or collaterally, to file
habeas petitions, or to challenge the conditions of their
confinement through civil rights actions.  <u>See</u> <u>Lewis</u>, 518 U.S. at
355; <u>Bourdon</u>, 386 F.3d at 92 & 95.  To prevail, the plaintiff
must first show that the available legal resources, including the
law library and other sources of legal information, taken as a
whole, were inadequate to meet his need to conduct legal
research, <u>see</u> <u>Bounds</u>, 430 U.S. at 832, and further prove that his
legal status was harmed by a deprivation of legal materials.  <u>See</u>
<u>Lewis</u>, 518 U.S. at 351.  Thus, in order to state a claim for
denial of access to the courts under § 1983, a prisoner must
allege that prison officials "hindered his efforts to pursue a
legal claim" that he is constitutionally entitled to pursue
during his incarceration.  <u>Id.</u>

    Here, Moyston alleges that he suffered harm due to the
library's closure on January 28, 2009, the day before he was
scheduled for an arraignment and a bail hearing, and that as a

20

result, he was forced to waive arraignment and forego an argument
for reduced bail.  Moyston, who has been held in HCDOC since
2008, was represented by an attorney from the New Hampshire
Public Defender's Office, <u>see</u> First Addendum at 40 (doc. no. 6),
presumably at all times relevant to this action, including his
January 29, 2009 hearing.  Given that the "appointment of counsel
can be a valid means of fully satisfying a state's constitutional
obligation to provide prisoners, including pretrial detainees,
with access to the courts," <u>Bourdon</u>, 386 F.3d at 94, Moyston's
represented status makes his claim of a denial of the right of
access to the courts suitable for dismissal.  <u>See</u> <u>id.</u> at 95-96
(dismissing detainee's section 1983 claim regarding adequacy of
law library for purposes of preparing criminal defense, because
detainee was represented by court-appointed counsel,
notwithstanding detainee's contention that appointed counsel was
ineffective).

In addition, Moyston has alleged that the library's
collection of bound materials is incomplete, that inmates lack
sufficient quiet space, that the librarian is untrained, and that
other factors including the limited hours of operation,
unannounced closures, and restrictions against copying and
printing all violate detainees' due process rights.  In
particular, Moyston asserts that when he was classified as
maximum security, he suffered more acutely from these limitations

21

as he was also denied physical access to the library; his requests for cell delivery of cases and research materials on issues pertinent to his criminal case yielded only a portion of what he actually requested at that time.

Moyston has failed, however, to allege specifically that he suffered any cognizable harm in pursuing a legal claim due to the claimed limitations of the library or the restrictions imposed on him while he was housed in maximum security.  Because the Complaint lacks any allegation relating to this element of the claim, see Lewis, 518 U.S. at 351, particularly in light of Moyston's status of being represented by counsel, Moyston's claims regarding the inadequacy of the library and the limitations on maximum security inmate access to the library should be dismissed.

### B. Equal Protection (Claim IV)

Moyston alleges that the policy of denying maximum security inmates physical access to the library violated his right to equal protection.  The Equal Protection Clause of the Fourteenth Amendment mandates that similarly situated persons be treated alike.  See City of Cleburne v. Cleburne Living Ctr., 473 U.S. 432, 439 (1985).  Moyston's equal protection claim should be dismissed because Moyston has not alleged that he was treated differently than any other similarly situated inmate.

### IV. Retaliation (Claim V)

22

Moyston asserts that he has suffered retaliation for exercising his First Amendment rights.  Specifically, Davine had him expelled from the library on February 11 and excluded from the library list on February 18 in retaliation for his filing a grievance relating to Davine on January 30; O'Mara restricted his ability to file grievances in the future in retaliation for his filing this lawsuit; and the mailroom staff, including the clerk, Cellee Beurdoin, has caused the loss or late delivery of certain items of his mail since April 28, 2009, in retaliation for this lawsuit.

To establish a First Amendment violation for retaliation, a plaintiff must show that he or she was engaged in protected speech, that the defendant took an adverse action against plaintiff, that there was a causal connection between the protected speech and the adverse action, and that an intent to retaliate was a "but-for" cause of the adverse action.  See McDonald v. Hall, 610 F.2d 16, 18 (1st Cir. 1979) ("Plaintiff must prove that he would not have been transferred 'but for' the alleged [retaliatory] reason."); see also Cossette v. Poulin, 573 F. Supp. 2d 456, 459-60 (D.N.H. 2008).  "Government actions, which standing alone do not violate the Constitution, may nonetheless be constitutional torts if motivated in substantial part by a desire to punish an individual for exercise of a constitutional right."  Mitchell v. Horn, 318 F.3d 523, 530 (3d

23

Cir. 2003) (internal quotation and alterations omitted).  An
"adverse action" may be found if defendants have subjected the
plaintiff to conduct that would deter an individual of ordinary
firmness from exercising his or her First Amendment rights.  See
Morris v. Powell, 449 F.3d 682, 686 (5th Cir. 2006).

    Applying these rules here, I find that Moyston engaged in
protected speech when he filed this action and used the grievance
process.  See McDonald, 610 F.2d at 18; see also Sprouse v.
Babcock, 870 F.2d 450, 452 (8th Cir. 1989).  Davine's expulsion
and exclusion of Moyston from the library, O'Mara's restricting
Moyston's access to the grievance system in the future, and
Beurdoin's involvement in losing or substantially delaying
delivery of Moyston's mail since April 28, 2009, are all adverse
actions.  In contrast, the allegations regarding alterations or
damage to the envelopes enclosing Moyston's mail are the type of
acts that are so de minimis that they cannot be considered
"adverse actions" for the purposes of a First Amendment claim.
See Morris, 449 F.3d at 686.

    While the Complaint includes information suggesting
nonretaliatory reasons for each adverse action alleged, it also
includes allegations providing the requisite causal connection
between these actions and Moyston's grievances or the lawsuit,
suggesting the existence of a retaliatory motive.  At this stage,
I cannot conclude that retaliation was not a "but-for" cause, in

light of all of the allegations in the Complaint.  Accordingly, I will direct service of the retaliation claim as to Davine, O'Mara, and Beurdoin in an Order issued this date.

V.    HCDOC Inmate Request & Grievance Procedures (Claim VI)

Moyston's claim regarding the adequacy of the HCDOC grievance procedures has two dimensions:  (1) inmates should have access to grievance forms without having to file written requests for such forms; and (2) defendant Scurry's investigation and response to grievances concerning his own actions rendered the grievance process biased.

As a preliminary matter, I note that Moyston's allegations regarding his difficulty in obtaining grievance forms from HCDOC officers resonates with claims sounding in a similar case, Proverb v. O'Mara, 2009 WL 368317 (D.N.H. 2009).  In Proverb's case, prison officials allegedly interfered with an inmate's access to the grievance process, by, among other things, discarding grievance forms, thereby depriving him of the right to petition the government for a redress of grievances.  Id. at *21. Here, Moyston's persistence enabled him to obtain the grievance forms he sought.  Moyston, unlike Proverb, challenges the adequacy of the process itself, not the allegedly illegal actions of specific officers.

I recommend dismissal of Moyston's claim for the following reasons.  There is no constitutional right to the existence of

25

inmate grievance procedures in the first instance.  <u>See</u> <u>Ramirez</u> <u>v. Galaza</u>, 334 F.3d 850, 860 (9th Cir. 2003).  As a corollary to this principle, there is no constitutional right to the existence of procedures that include certain attributes, such as unbiased investigators and automatic access to grievance forms, <u>see</u> <u>id.</u> (allegations regarding absence of certain procedural protections in internal prison grievance process lacked "constitutional foundation").  I note that Scurry was not the ultimate decision maker on the grievances at issue; Dion rendered a decision after reviewing each grievance and Scurry's response.

A person who has suffered a deprivation of a liberty interest may have a valid due process claim under section 1983, <u>see</u> <u>Wilkinson v. Austin</u>, 545 U.S. 209, 221 (2005), but Moyston has not shown that he has suffered a deprivation of any state-created liberty interest through the application of the procedures at issue.  Moyston, for example, has not cited to any pertinent portion of any HCDOC guidelines or handbooks setting forth pertinent grievance procedures that might give rise to such a liberty interest.  Indeed, the Complaint recounts Scurry's remark that no guidelines regarding the grievance procedures at HCDOC exist.  <u>See</u> Complaint at 4 (doc. no. 1).  Because Moyston lacks any constitutional right or liberty interest in the specific grievance procedures he prefers, the Court should dismiss Moyston's claims regarding the adequacy of the grievance

26

process at HCDOC.

VI.  Criminal Liability (Claim VII)

Moyston requests a finding that defendants Cellee Beurdoin and Willie Scurry are criminally liable for false statements that they have made, and additionally, as to Beurdoin, for tampering with the mail.  "[A] private citizen lacks a judicially cognizable interest in the prosecution or nonprosecution of another."  Linda R.S. v. Richard D., 410 U.S. 614, 619 (1973).  Thus, Moyston's request for a judgment of criminal liability against Beurdoin and Scurry is without an arguable basis in law.

VII. FOIA (Claim VIII)

Moyston alleges that he is entitled to obtain copies of HCDOC policies free of charge under FOIA, 5 U.S.C. § 552, and that they should be made available in the law library.  FOIA relates to the document disclosure obligations of agencies of the federal government.  See id. §§ 551(1) & 552.  Thus, Moyston cannot cite FOIA as a basis for finding HCDOC officials liable under section 1983 for failing to provide Moyston with access to a free copy of HCDOC policies.

The State Right-to-Know Law, N.H. Rev. Stat. Ann. §§ 91-A:1 to -A:15, similarly grants citizens the right to inspect and copy government records in the possession of county agencies.  This law authorizes agencies to charge the actual cost of making a copy of a government record, if the agency must use a copier or

printer to make the record available.   See id. § 91-A:4, IV.

Therefore, Moyston cannot cite to any state or federal law

granting him the right to a free copy of the HCDOC policies.

Accordingly, I recommend that Claim VIII be dismissed for failure

to state a valid claim under section 1983.

VIII. Supervisory Liability

        "Supervisory liability under § 1983 cannot be predicated on

a respondeat theory, but only on the basis of the supervisor's

own acts or omissions."  Aponte Matos v. Toledo Davila, 135 F.3d

182, 192 (1st Cir. 1998) (internal citations omitted).  The

standard set forth in the First Circuit is that a supervisor may

be held personally liable "for the behavior of his subordinates

only if '(1) the behavior of his subordinates results in a

constitutional violation, and (2) the supervisor's action or

inaction was affirmatively linked to that behavior in the sense

that it could be characterized as supervisory encouragement,

condonation or acquiescence or gross negligence amounting to

deliberate indifference,'" leading inexorably to the

constitutional violation.  Pineda v. Toomey, 533 F.3d 50, 54 (1st

Cir. 2008) (citation and internal brackets omitted).  A

supervisor must be either "a primary actor involved in, or a

prime mover behind, the underlying violation."  Camilo-Robles v.

Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999).

        Moyston has named O'Mara and Dion as defendants to this

action in their supervisory capacities.  O'Mara is also named as

a defendant for personally restricting Moyston's access to the

grievance process in the future.  As to the supervisory liability

claim, Moyston alleges that O'Mara and Dion both neglected to

protect Moyston in response to his filing grievances regarding

the pertinent allegations in this action.  Because O'Mara and

Dion are responsible for HCDOC operations, and Moyston's

grievances provided them with actual knowledge of the alleged

constitutional violations presented here, their repeated failure

to act suffices to state claims against these individuals in

their supervisory capacities, and I will so direct in the Order

issued simultaneously with this Report and Recommendation.

Conclusion

In summary, the following claims may proceed, as enumerated

above:  the Fourteenth Amendment medical care claim (Claim I),

insofar as it relates to Moyston's blood pressure complaint, eye

condition, and testicular pain; and the First Amendment

retaliation claim (Claim V), relating to Moyston's exclusion from

the library, lost and late mail, and the restrictions on his

filing grievances.  I will direct service of these claims on the

following defendants:  (1) as to the medical care claim, Dr.

Braga, Nurse Descar, and Nurse Ryan; and (2) as to the

retaliation claim, O'Mara, Beurdoin, and Davine.  In addition,

except as to the retaliation claim based on O'Mara limiting

29

Moyston's access to the grievance system, I will direct service of each retaliation and medical care claim upon Dion and O'Mara in their supervisory capacities.  For reasons set forth more fully above, I recommend dismissal of all remaining claims and defendants listed in the Complaint (doc. nos. 1, 6 & 12).

The identification of the claims in this Report and Recommendation will be considered in this case to be the claims raised in the Complaint for all purposes.  If the plaintiff disagrees with this identification, the plaintiff must file an objection thereto within ten (10) days of receipt of this notice, or properly move to amend the Complaint.

Any objections to this report and recommendation must be filed within ten (10) days of receipt of this notice.  Failure to file objections within the specified time waives the right to appeal the district court's order.  See Unauthorized Practice of Law Comm. v. Gordon, 979 F.2d 11, 13-14 (1st Cir. 1992); United States v. Valencia-Copete, 792 F.2d 4, 6 (1st Cir. 1986).

James R. Muirhead
United States Magistrate Judge

Date:     August 31, 2009

cc:       Jerome Moyston, pro se

30